IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                                      Criminal Action No.: 5:15–CR–57
                                                                                   (JUDGE STAMP)

FRANK BOATRITE,

    Defendant.

## REPORT AND RECOMMENDATION

### I. BACKGROUND

On October 6, 2015, Frank Boatrite ("Defendant" or "Boatrite") was named in a one-count Indictment alleging Prohibited Person in Possession of a Firearm. ECF No. 1. Because Boatrite was already in the custody of the State of Ohio, and upon Petition by the United States ("Government"), the undersigned issued an Order Granting the Government's Motion for Writ of Habeas Corpus *ad prosequendum* on October 7, 2015. ECF Nos. 3 & 5. On October 7, 2015, the Court appointed Brendan S. Leary, Esq., as counsel for Defendant in this matter. ECF No. 7. On December 23, 2015, Mr. Leary filed a Motion to Suppress on Boatrite's behalf. ECF No. 18. Accordingly, on January 26, 2016, the undersigned held a hearing on the Defendant's Motion.

At the suppression hearing, the Government appeared by Stephen L. Vogrin, Esq., and the Defendant appeared in person, and by counsel, Mr. Leary. ECF No. 24. The Government called Trooper Michael S. White and Corporal Matthew Beatty as witnesses at the hearing. ECF No. 22. The Defendant also called Lindsay Elizabeth Bass as a witness. *Id.*

Upon consideration of the filings, testimony, evidence, and exhibits submitted by both parties, this Court is now prepared to provide the District Court with its Report and Recommendation regarding Defendant's Motion to Suppress Evidence.

## II. DISCUSSION

**A. LEGAL STANDARDS**

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. "Searches without probable cause are presumptively unreasonable, but if an individual consents to a search, probable cause is unnecessary." *United States v. Robertson*, 736 F.3d 677, 679-80 (4th Cir. 2013) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth* 412 U.S. at 228.

The Fourth Circuit "has long recognized that the Government must shoulder the burden of proving that an individual 'freely and intelligently [gave her] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied.'" *United States v. Morrow*, 731 F.2d 233, 235–36 (4th Cir. 1984) (quoting *United States v. Vickers,* 387 F.2d 703, 706 (4th Cir. 1967), *cert. denied,* 392 U.S. 912 (1968) (internal quotations omitted)). "Moreover, that burden is a concededly heavy one, [because] the fourth amendment admits but 'few specifically established and well-delineated exceptions' to the warrant requirement." *Id.* (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). As in *Robertson*, "[t]his case turns on the difference between voluntary consent to a request versus begrudging submission to a command." 736 F.3d at 680.

In American jurisprudence, *Schneckloth v. Bustamonte* is the seminal case on whether an

individual's consent was voluntary. 412 U.S. 218 (1973). The *Schneckloth* Court held, "when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." 412 U.S. at 248. Furthermore, the Court held that "[v]oluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* at 248–49. The Supreme Court declined to define "voluntary" in this context; however, the Court stated, "[i]t is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of 'voluntariness.'" Id. at 224.

Instead, the *Schneckloth* Court adopted a totality of the circumstances test to evaluate "whether a defendant's will was overborne in a particular case . . . ." *Id.* at 226. The Court also recognized that "two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Id.* at 227. Yet, the Court was clear about the importance of protecting individuals' Fourth Amendment rights:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Id.* at 228–29 (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)).

The Fourth Circuit has explained "that 'voluntariness' is a fluid concept, varying with specific surroundings and circumstances: the number of officers present at the time of consent; the subjective state of mind, intelligence, and age of the consenting party; the length of detention; and the individual's knowledge of his or her right to refuse consent." *Morrow* at 236. Moreover, "[i]n examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth* at 229. Accordingly, "searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches." *Id.*

Finally, the Fourth Circuit has succinctly explained the proper analysis courts shall undertake when a defendant challenges the voluntariness of one's consent:

> We apply a subjective test to analyze whether consent was given, looking to the totality of the circumstances. *Wilson,* 895 F.2d at 171–72. The government has the burden of proving consent. *See United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Relevant factors include the officer's conduct, the number of officers present, the time of the encounter, and characteristics of the individual who was searched, such as age and education. *Lattimore,* 87 F.3d at 650. Whether the individual searched was informed of his right to decline the search is a "highly relevant" factor. *Wilson,* 895 F.2d at 172.

*Robertson*, 736 F.3d at 680.

**B. SUPPRESSION HEARING TESTIMONY**

At the outset of the hearing, Mr. Leary advised the Court that Defendant does not contest that Ms. Bass had authority to grant consent. Further, Mr. Leary advised that, as he understood it, the issue was whether there was consent and whether the consent was voluntary. The Court then asked the Government if it contested standing, and Mr. Vogrin, on behalf of the Government, advised that it did not. Because no warrant was issued for the search in question, the Court then advised the

parties that it was the Government's burden and allowed it to begin calling its witnesses.

Corporal Matthew Beatty ("Cpl. Beatty") works for the Brooke County Sheriff's Department, and has been assigned to the Hancock-Brooke-Weirton Drug Task Force for approximately five years. Cpl. Beatty testified that Lieutenant Arthurs called and asked him to come to Defendant's residence to assist with a situation. When Cpl. Beatty arrived, there were approximately three police officers already there, all of which were in uniform.

After Defendant and his brother were taken into custody and placed in the back of a police cruiser, Cpl. Beatty then cleared the residence where the Boatrites exited. When Mr. Vogrin asked Cpl. Beatty to explain how he did that, Cpl. Beatty testified that he and Lieutenant Arthurs went inside. They saw Ms. Bass. They asked her if anyone else was in the residence. At that time she said she did not think so. They asked her if they could search the residence for any people, and then searched the trailer. Cpl. Beatty further testified that that search was a "protective sweep" and it lasted for about two minutes.

Cpl. Beatty testified that, after the protective sweep, he and Lieutenant Arthurs exited the trailer, Trooper Michael S. White ("Trooper White") arrived, and then Lindsay came outside and they spoke with her. Cpl. Beatty said that Trooper White arrived approximately ten to fifteen minutes after the Boatrites were arrested. Cpl. Beatty testified that nobody had any contact with Ms. Bass from the completion of the protective sweep until Trooper White arrived and spoke to her.according to Cpl. Beatty, Ms. Bass remained alone in her trailer during this time,.

Cpl. Beatty stated that Trooper White spoke with Ms. Bass as soon as he arrived at the residence, and Cpl. Beatty was standing with him. Cpl. Beatty testified that Trooper White discussed that there were allegations that drugs and guns were in the residence, and then Ms. Bass invited them

5

inside, and while they were in there, they asked her if she was willing to give consent to search the residence. Cpl. Beatty said Ms. Bass was sitting in her living room, smoking cigarettes, while the two officers stood and spoke to her. Mr. Vogrin asked Cpl. Beatty if the conversation was relaxed and nonconfrontational, and he responded that it was. Mr. Vogrin also asked if any law enforcement officers made criminal accusations against Ms. Bass at that time, and Cpl. Beatty said no. Cpl. Beatty then testified that Ms. Bass gave consent, verbally and in writing.

On cross examination, Cpl. Beatty testified that Ms. Bass did not say that she was hesitant to let the police search when he came in to perform the protective sweep. Further, he testified that Ms. Bass never expressed any concern that she was uncomfortable in allowing the search. Mr. Leary asked Cpl. Beatty if it was his testimony that he asked Ms. Bass for her consent to conduct the protective sweep; Cpl. Beatty said he did, even though he did not have to ask. Id. Cpl. Beatty further testified that he accused or asked her whether drugs were in the trailer and told her that he had been informed that drugs were inside the residence.

The Government also called Trooper White, who is assigned to the Bureau of Criminal Investigations and also a member of the Hancock-Brooke-Weirton Drug Task Force. Trooper White testified that by the time he arrived at Defendant's residence, Defendant and his brother had already been arrested and removed from the scene. Trooper White testified that the search occurred around 11:00 a.m. Lindsay Bass was Defendant's girlfriend at the time. Ms. Bass and Defendant shared the residence, and when Trooper White first arrived, she was inside the trailer. Trooper White knocked on the door, introduced himself, and asked if he could step inside and speak with her. Then, they talked about the incident that had just occurred and about the accusations of firearms and drugs being at the residence.

Trooper White testified that after this, they went into the living room, and Ms. Bass asked if she could smoke a cigarette, which he advised her that she could. Trooper White then stated that he asked Ms. Bass if she would be willing to consent to a search of the residence, and he gave her a consent form that his department uses. The Government asked Trooper White who else came into the trailer, and he stated that Deputy U.S. Marshal Chad Simpson and Detective Beatty from the Brooke County Sheriff's Department came inside. Trooper White testified that he, and all the other officers, had weapons on them, but they were holstered and only Cpl. Beatty's was visible.

Trooper White said that he spoke with Ms. Bass about getting her consent to search the residence. Specifically, he said, that he advised her he was told there were firearms and drugs in her trailer. Then, he explained the consent form to her by reading it, and then filled out the description section. He told her that if she was willing to consent, he just needed her signature on the form, and if she had any questions to ask them at that time. He testified that she agreed to the consent form and signed it.

In response to Mr. Vogrin's questions, Trooper White testified that he did not make any criminal accusations against Ms. Bass, her freedom of movement was not restricted in any way, and their conversation was non-confrontational and relaxed. He also testified that he told Ms. Bass she could tell him to stop searching. Trooper White also testified that Ms. Bass did not appear to be under the influence of any controlled substance or alcohol at that time. However, he testified that Ms. Bass told him she was a heroin user, and Trooper White found evidence of illegal drugs in the residence.

On cross examination, Trooper White testified that he was not sure exactly how many officers were on the scene before he arrived, but he testified that there were four other officers upon

his arrival. He also testified that he was unaware if any other officers spoke to Ms. Bass about searching the residence. He further testified that Cpl. Beatty advised him that he had conducted a protective sweep, but he was unaware of anything that may have been said to Ms. Bass prior to his arrival. Trooper White did not know if any other officers accompanied Cpl. Beatty during the protective sweep. Trooper White also testified that police do not seek consent for most protective sweeps. Mr. Leary then asked if he knew whether any of the other officers had already asked for consent to search, and Trooper White testified that he did not know. Mr. Leary asked, if Ms. Bass asked him if she could refuse the search. Interestingly, Trooper White responded that Ms. Bass never specifically asked whether she could refuse.

Trooper White testified that he told Ms. Bass he was looking for guns and drugs. Trooper White testified that some drugs were found in the residence, but Mr. Leary questioned why this information was not in a report Trooper White prepared for the ATF. Trooper White explained tha tit was in "the other report." Mr. Leary inquired about the other report, and Trooper White explained that it includes more dates and it includes another related investigation. Mr. Leary asked Trooper White what other investigation he was referring to, and Trooper White said that he indicted two other individuals along with Boatrite, and that entire case in provided in one report. Mr. Leary then clarified that Boatrite was not indicted as part of that drug investigation Trooper White was referring to, and Trooper White agreed.

Mr. Leary also questioned Trooper White about what he included in the report to the ATF about his interaction with Ms. Bass in obtaining her consent. Mr. Leary made note that there were only two sentences in Trooper White's report regarding Ms. Bass's consent. Mr. Leary asked, if they could agree that Trooper White's report says he asked Ms. Bass for consent, she gave it, and she

signed the form, and that is the extent of what he wrote about her consent. Trooper White agreed.

The Defendant then called his only witness, Lindsay Bass, who testified that she is an unemployed twenty-four-year-old high school graduate, who dated the Defendant at the time of his arrest and the search in question. She testified that when the events in question took place, she and Defendant had just gotten out of bed.

Ms. Bass testified that when Defendant exited the trailer, she heard the cops say to him something along the lines of, "you think you're going to come down to West Virginia and start cooking meth." Ms. Bass testified that shortly after that, she moved into the doorway so the officers could see her. She could not remember exactly how many officers were there, but she recalled that all of them were in uniform except for one, and they all had guns. She did not recall, at that time, whether their guns were out or holstered, or whether they had long guns or handguns.

Defendant and his brother were then taken into custody, and Ms. Bass testified she was standing in the doorway to the trailer when officers approached her. She stated that the officers made a line up to her, and, at that point, they had their guns drawn. The first cop who came in asked if he could search her house for other people. Ms. Bass testified that she asked him, "can I say no?" She testified that he told her "no," and he shoved her out of the way and then all of the officers just went on into her trailer. Mr. Leary asked Ms. Bass to describe the first officer who told her "no," and she described an older, bald man with glasses. She identified him as "a Follansbee cop."

Ms. Bass testified that the protective sweep search did not take very long, and the officers looked all throughout her residence, while pointing out stuff in the house. Specifically, she said one officer pointed out Mucinex on her table, and he said, "you know that they use that to make meth, don't you?" Mr. Leary asked if she knew who said that to her, and she testified that Detective Matt

9

Beatty said it. Ms. Bass testified that she was nervous at that point, and cops had never been in her house like that before. She also said that Cpl. Beatty told her if she wanted to play games, they could play games, and he would run her name and get her record to see all of the Sudafed she had bought. Ms. Bass testified that Cpl. Beatty did not raise his voice to her, but he had an attitude.

Next, Ms. Bass testified, the officers started asking her if they could search her residence. She could not remember which officer or officers were asking her at this point in time, but she testified that they told her they were looking for stuff related to making meth. She also testified that the officers told her they knew she and Defendant were cooking meth. Mr. Leary asked Ms. Bass what she said when they asked if they could search the trailer, and she testified that she tried to tell them no, that she felt uncomfortable, but they kept asking. Then, the officers asked her if she would step outside with them.

Ms. Bass testified that she walked outside with "Mike," and Mr. Leary asked if she knew who Mike is, and she said he called himself "last chance Mike." Specifically, she testified, after they had already done the first sweep of the house to make sure no one was there, "Mike" showed up, and the first thing he told her when he came into her trailer was "I'm last chance Mike." Ms. Bass further testified that Trooper White went on to explain that he was her last chance, and if she told him the truth, he would do what he could to help her, but he was her last opportunity to tell the truth. Mr. Leary asked if Ms. Bass knew what Trooper White was referring to when he said he wanted her to tell the truth, and she said it was about making meth. Mr. Leary asked Ms. Bass if Trooper White ever accused her of making meth, and she said they all did; that's all they kept talking about.

Regarding his demeanor toward her, Ms. Bass testified that Trooper White was not aggressive toward her. Ms. Bass also testified that she felt like the officers were pressuring her. She

10

elaborated: Once we got outside, they kept asking her if they could search, telling her it was her house, but she told them she was uncomfortable with it. Then, they told her that they would detain her somewhere away from her residence, and would not let her back in, until they got a search warrant.

Mr. Leary had Ms. Bass go back through the series of events that led up to that moment, and she explained that she went outside with Trooper White and stood by an officer's car while he spoke to her. Trooper White asked her if she could search her trailer, and that's when he told her, if she did not just give them permission, they would not let her back inside the residence. They would detain her somewhere else. He said it would be easier on her so they all would not have to wait on the warrant–it would just be a waiting game.

Ms. Bass testified that she felt like if she did not allow them to search for what they wanted, they were not going to let her go back in her house–because that is what they told her. Ms. Bass testified that she believed she would be taken away from her residence if she refused to consent to the search because the police officers already had her outside. She said that Trooper White quickly went over the consent form, she did not read it, but he reviewed it quickly.

Ms. Bass testified that the officers would raise their voices at her when they were accusing her of being in the drug business or when they thought she was lying to them. Mr. Leary asked if she thought she could just ask the officers to leave, and she said, no, not at all–they were all over the house. Mr. Leary asked her what she thought would happen if she did ask them to leave, and she testified, they would just tell her no, like they did when she asked them if she could say no about them coming in the first time. Finally, Mr. Leary asked Ms. Bass if the officers ever told her that she could withdraw her consent at any time, and she testified that they did not tell her that.

On cross examination, Ms. Bass testified that she spoke with Trooper White about her drug usage, relationship with Defendant, and other various similar topics. She testified that Trooper White was nice to her. When Mr. Vogrin asked if she could have left her trailer if she wanted, Ms. Bass said, she guessed. She did not really know if she could. She did not ask to leave. She did not want to leave. That is why she signed the consent form in the first place.

When Mr. Vogrin presented Ms. Bass with Government's Exhibit One, the consent form Trooper White testified to filling out and reading to Ms. Bass, she testified that was not the form she signed initially to give the officers permission to search. Ms. Bass testified that the officers gave her a copy of Governments Exhibit One *after* they searched.

On redirect, Ms. Bass testified that before she signed the consent form, while still inside her trailer, the officers intimidated her and were rude to her. They accused her of things, and she did not believe she could tell them to stop because she had already tried and they did not listen. She said nobody told her she could tell the officers to stop, and before she signed the consent, she did not think she had a choice in the matter. She testified that one of the officers told her she was going to be detained elsewhere until they got their search warrant if she did not consent. Ms. Bass testified that the friendly conversation with Trooper White about her personal life occurred *after* she signed the consent form. She also testified that Cpl. Beatty was mean the entire time.

The Court then inquired about Ms. Bass's testimony regarding the consent form she signed before the search was performed. Ms. Bass testified that the officers gave her Government's Exhibit One after the search, but beforehand, she initialed and signed a preprinted paper that was all typed and looked formal. Mr. Leary then asked Ms. Bass if the form she signed beforehand had checkboxes, and she indicated that it did. Mr. Leary asked if she had to initial little boxes, and Ms.

Bass indicated she thought so, but she did not have to check any—she only initialed and signed her name. Mr. Vogrin asked Ms. Bass if she thought by initialing and signing this other form she was giving the officers consent to search, and she indicated that was correct. At the conclusion of the hearing, the Court asked the Government to inquire regarding other consent form Ms. Bass referred to in her testimony.

**C. CREDIBILITY DETERMINATIONS AND FINDINGS OF FACT**

Regarding the witnesses testimony, the undersigned finds Ms. Bass's testimony to be credible; Trooper White's testimony was mostly credible, and Cpl. Beatty's testimony was only somewhat credible.

The undersigned finds that, throughout this incident at Ms. Bass's trailer, there were anywhere from three to six police officers present at any one time. Ms. Bass was not incapacitated due to drugs or alcohol, and there was no other reason that she could not have provided a knowing and voluntary consent. Further, the entire incident likely lasted somewhere between forty five minutes and an hour.

Moreover, the undersigned finds that at least some of the officers made accusations toward Ms. Bass, and the accusations included specific remarks about meth being made in her residence. The undersigned also finds that Ms. Bass gave the officers verbal consent to search her trailer and signed a consent form; however, the form Ms. Bass signed is not the one entered as an exhibit, and the Government was unable to locate or produce that specific form. The only issue for the Court to decide is whether the consent Ms. Bass gave was voluntary.

**IV. ANALYSIS**

"A search conducted pursuant to valid consent is one such well-recognized exception to the

Fourth Amendment's general warrant requirement. If consent is challenged, the district court must determine, based upon the 'totality of the circumstances,' whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence." United States v. Bryant, No. 1:15CR99 1, 2015 WL 2248177, at *2 (M.D.N.C. May 13, 2015) (internal citations omitted).

The police did not obtain a warrant to search Ms. Bass's trailer in this case. Defendant has challenged whether Ms. Bass consented and whether any consent she may have given was voluntary. It is the Government's burden to prove by a preponderance of the evidence that Ms. Bass did in fact give knowing and voluntary consent to search her trailer, and this Court must make that determination based upon a totality of the circumstances, with attention to specific inquiries as enumerated by the Fourth Circuit.[1]

Ms. Bass is a twenty-four-year-old woman. She was, and may still be, a drug user. She is a high school graduate. She did not appear or claim to be under the influence of drugs at the time she gave consent for officers to search her trailer. Her testimony was candid and credible. She testified that, for the most part, the police officers were friendly with her, they never pointed their guns directly toward her, never used physical force against her to obtain her consent.

Ms. Bass testified that the officers kept saying they were looking for evidence that meth was being made in her trailer. She gave numerous details about various comments the officers made and things they did related to their accusations in this regard. Yet, neither Trooper White nor Cpl. Beatty mentioned anything about meth, specifically. They both testified that they were told drugs and guns

---

[1] *See United States v. Robertson*, 736 F.3d 677, 680 (explaining that "[r]elevant factors include the officer's conduct, the number of officers present, the time of the encounter, [] the characteristics of the individual who was searched, such as age and education[, and w]hether the individual searched was informed of his right to decline the search is a 'highly relevant' factor) (internal citations omitted).

14

were in the trailer, and they both agreed that they made accusatory statements toward Ms. Bass about the presence of drugs in the trailer.

Trooper White acknowledged that he only included two brief sentences about getting Ms. Bass's consent in the report he created for the ATF shortly after the incident occurred. Cpl. Beatty and Trooper White are officers assigned to an area drug task force, who were both specifically called out to this incident. Moreover, Trooper White testified that Defendant was indicted along with Charles Marker and Harold Midcap; however, those two individuals are named in a separate Indictment without Defendant, which Trooper White conceded. Interestingly, the men named in this other indictment–who Trooper White initially testified he indicted together with Defendant–are alleged to have been involved in a methamphetamine conspiracy. This lends itself to Ms. Bass's testimony that the officers were accusing her trailer of being a meth lab and that they were asking her for consent to find evidence of the same.

Ms. Bass testified that an officer, who the Government did not present at the hearing, pushed her out of the way when the protective sweep was preformed. Ms. Bass also testified that when she asked if she could say no to this search, this officer told her "no." Trooper White was not on scene when this took place, and Cpl. Beatty was, rightly, unable to testify as to what other officers may have said to Ms. Bass throughout the incident. There were at least three other law enforcement officers involved in this incident who were not called to testify at the hearing. Given Ms. Bass's testimony about what happened, the Court's finding that she was credible, and a lack of testimony to refute her version of some of the events that took place, the Court is left to find that what she testified to, under oath, actually happened.

Throughout this incident at Ms. Bass's trailer, there were approximately three to six police

officers present at any one time. Ms. Bass watched her boyfriend, Defendant, get arrested while police officers had their weapons drawn and trained on him. Then, officers performed a protective sweep, and an unnamed officer from Follansbee asked Ms. Bass if they could search her trailer–pushing her out of the way and telling her "no" when she asked if she could say no. All three witnesses testified that Ms. Bass asked if she could smoke cigarettes while they talked, and she smoked several. Ms. Bass was nervous, and she said she felt pressured to consent. Ms. Bass testified that she was never told that she could ask the officers to stop searching or that she could refuse. Trooper White testified that he informed Ms. Bass of these rights. It is likely somewhere in the middle; Trooper White probably said something to that effect while going over all of the language in the form, which Ms. Bass said he did quickly. It may have been announced in form but under the circumstances, it was absent in substance.

Ms. Bass testified that Trooper White told her he was "last chance Mike" and asked her to come outside with him, where he essentially gave her an ultimatum while standing next to a police car: consent to a search of the trailer or be detained away from her residence while the officers sought a search warrant.

It is clear to this Court, under the totality of the circumstances test articulated by the Fourth Circuit, that Ms. Bass's will was overborne by her encounter with law enforcement, their accusations, tactics, and the ultimatum they presented to her. The consent she undoubtedly gave was not voluntary. The burden of proof rests on the Government's shoulders, and it failed to show Ms. Bass's consent was voluntary by a preponderance of the evidence. Accordingly, the search of Defendant's and Ms. Bass's trailer violated Defendant's Fourth Amendment right to be free from unreasonable searches, and it should suppressed.

## V. RECOMMENDATION

Based on the foregoing, the undersigned hereby **RECOMMENDS** that [ECF No. 18] Defendant's Motion to Suppress Evidence should be **GRANTED**.

Because trial is imminent, any objections to this Report and Recommendation shall be filed by February 10, 2016.

Dated: February 2, 2016

/s/ *James E. Seibert*
JAMES E. SEIBERT
U.S. MAGISTRATE JUDGE